QUINN EMANUEL URQUHART & SULLIVAN, LLP
 Sam S. Stake (Cal. Bar No. 257916)
 samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600

QUINN EMANUEL URQUHART & SULLIVAN, LLP
 Sami H. Rashid (*pro hac vice* forthcoming)
 samirashid@quinnemanuel.com
 David LeRay (*pro hac vice* forthcoming)
 davidleray@quinnemanuel.com
295 Fifth Avenue, 9th Floor
New York, New York 10016
Telephone:    (212) 849-7000

*Attorneys for Ollywan Limited*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLLYWAN LIMITED, <br><br> Plaintiff, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | CASE NO. 5:25-cv-08215 <br><br> **CIVIL COMPLAINT** <br><br> JURY TRIAL DEMANDED |

**OVERVIEW OF ACTION**

1. Ollywan Limited ("Ollywan"), by its undersigned counsel, brings this complaint against Meta Platforms, Inc. ("Meta") for monopolization and attempted monopolization. This case affects billions of dollars in online commerce and presents critical antitrust and competition issues in the increasingly important world of digital commerce.

2. At bottom, this case presents a textbook example of anticompetitive tying. Meta has exploited its social networking dominance to crush innovative competition in the separate market for applications enabling tag-based shopping through social media content ("Tag-based Shopping"), not through superior products, but through systematic exclusionary conduct that eliminated consumer choice and stifled technological progress.

3. Meta[1] deliberately stole Ollywan's innovative business plan and tied its monopoly in the market for social networks to foreclose competitive alternative products in the market for Tag-based Shopping. The company also weaponized its advertising platform to prevent competitors from reaching consumers. This conduct transformed what should have been a competitive market into a Meta monopoly worth over $2 billion annually.

4. In November 2015, Hilmi Konde (the CEO of Ollywan) approached Meta with a proprietary and comprehensive business plan he had developed from the ground up. Konde's innovative plan involved the development of a revolutionary business model that would integrate social networking with native e-commerce functionality. This was not merely a social commerce app with product tagging and affiliate shopping, but a pioneering unified ecosystem where users could seamlessly transition from social interactions to commerce transactions within a single platform. No company had yet integrated photo-based social commerce into an application like Konde had proposed, making Konde's comprehensive business plan and technical architecture uniquely valuable and proprietary.

---

[1] Meta was formerly known as Facebook. This name change occurred on October 28, 2021. Throughout this Complaint, we refer to Meta even during the time the company was known as Facebook.

5.     The plan detailed how his technology would work and how he would bring the product to market and monetize it.  Specifically, after securing agreement from Meta executives that their discussions would be kept highly confidential, Konde met with David Marcus (Meta's VP of Messaging) and Mike Schroepfer (Meta's Chief Technology Officer) on November 3, 2015 at Web Summit Dublin in Dublin, Ireland in Facebook's private lounge.  Notably, Schroepfer excused himself from the meeting before Konde began disclosing proprietary details, demonstrating Meta's recognition of the confidential nature of the information.  During this meeting with Marcus, Konde disclosed proprietary technical specifications, detailed revenue models, platform integration strategies, and monetization frameworks that he had spent months developing under strict confidentiality, as evidenced by his business plan dated September 30, 2015.

6.     Meta's executives were so impressed that they encouraged Konde to continue development, with David Marcus explicitly stating, "When you come back to us with a refined solution, we can potentially work together."  The same day as the meeting, Konde sent messages to Meta executive Akin Babayigit confirming Marcus's enthusiasm and request for further development.

7.     But instead of partnering, and a mere six weeks after Konde and Ollywan had launched Winstag (Ollywan's Tag-based Shopping platform), Meta secretly copied Konde's business plan and launched Instagram Shopping—implementing features that Meta had not previously possessed or publicly disclosed, and that were virtually identical to what Konde had confidentially shared with Meta.

8.     The proof of Meta's anticompetitive conduct is in the timeline: for four years after acquiring Instagram in 2012, Meta made no meaningful moves toward social commerce.  Only after Konde's confidential disclosure in November 2015 to Meta executives, followed by the official launch of Winstag in September 2016, did Meta suddenly develop and launch Instagram Shopping in November 2016, implementing the precise technical architecture and business model Konde had shared confidentially.

9.     Instagram Shopping did not win because it was better than Winstag—it was a copycat.  Instagram Shopping succeeded because Meta illegally tied it to Instagram's two billion

users, creating an insurmountable advantage no independent competitor could overcome, regardless of product quality or innovation.

10.     Cementing that inherent advantage, Meta deliberately engineered technical and contractual barriers to prevent competition from Ollywan and other would-be competitors. Instagram users cannot access alternative shopping services on Instagram, and third-party shopping apps cannot integrate with Instagram's platform.  And merchants must use Instagram Shopping if they want to use a Tag-based Shopping solution on Instagram.

11.     While some social media platforms successfully integrate with third-party applications through application-programming-interfaces ("APIs") that allow independent computer programs to interact and coordinate with the social media platforms, Meta does not.  Meta previously allowed such integrations to some degree on its Facebook social network, but strategically eliminated those APIs later to foreclose competition.  Meta did not even bother pretending it would support such integration on Instagram.

12.     Meta's conduct has foreclosed the Relevant Market for Tag-based Shopping on Social Network Platforms.  Industry analysts consistently recognize Tag-based Shopping as a distinct market segment.  Leading research firms including eMarketer, Forrester, and McKinsey publish separate market analyses for "social commerce" or "social shopping" distinct from both traditional e-commerce and social media advertising markets.  It is this separate market where Meta has foreclosed competition.

13.     But to be clear, Meta did far more than illegal tying.  Recognizing that social commerce competitors needed advertising to acquire users, Meta weaponized its dominant advertising platform—representing 75% of social media advertising—to impact Winstag's ability to recruit potential customers.

14.     While Meta's advertising platform accepted "Winstag" campaigns so that Meta could collect Ollywan's advertising dollars, the Facebook Developer Console forced the use of "W1nstag" rather than "Winstag" when advertisements presented users the actual prompt to link their Meta account to Winstag's application.

15.     This created a significant trust barrier: users who clicked paid "Winstag" advertisements and downloaded "Winstag" from app stores were confronted with "W1nstag wants to access your data" at login, causing widespread user abandonment.  Meta profited from Winstag's advertising spend while simultaneously undermining its conversion funnel through this forced naming mismatch.  Yet Winstag was crippled by Meta's anticompetitive behavior, because its inability to recruit users drastically hindered Winstag's ability to grow.

16.     Again, the proof of Meta's anticompetitive conduct is in the timeline: Meta raised no trademark objections to "Winstag" until immediately after launching Instagram Shopping in November 2016.  This pretextual enforcement continued through the present, creating an ongoing violation that demonstrates Meta's persistent intent to exclude competition rather than protect legitimate trademark interests.  Meta's suppression caused direct harm to Winstag and inhibited its business operations through at least August 2023, when Winstag shut down its live applications.

17.     Testing conducted on July 21, 2025 confirmed "Winstag" remains blocked while variants on Instagram's trademark like "Instant" are accepted, proving that discriminatory enforcement continues today.  Meta's suppression caused direct harm to Winstag and inhibited its business operations through at least August 2023, when Winstag was forced to shut down its live applications due to the cumulative impact of Meta's anticompetitive conduct.

18.     Meta's actions have directly harmed consumers through supracompetitive pricing, reduced innovation, and eliminated choice.  Meta charges merchants on Instagram 5-7% commission rates for Instagram Shopping—far exceeding the rates that would prevail in a competitive market.  Meta passes on these inflated commissions directly to consumers through higher product prices.

19.     Meta's suppression of innovation is equally significant.  For example, consumers have been deprived of superior privacy protections, better user interfaces, enhanced product discovery algorithms, and creator-friendly revenue sharing agreements that could have come to market.

20.     This harm extends beyond individual transactions to encompass the broader competitive process.  Meta's conduct has created a "competition desert" in social commerce,

deterring venture capital investment and entrepreneurial innovation because startups cannot overcome Meta's artificial barriers regardless of their technological advantages.

21.    The antitrust laws exist precisely to prevent conduct where market success derives from exclusionary practices rather than superior performance.  Meta's unfair competition, illegal tying arrangements, and pretextual trademark abuse exemplify anticompetitive conduct.  Such behavior requires judicial intervention to restore competitive markets.  Indeed, Meta's anticompetitive efforts to wield its social media dominance to stymie Ollywan and tag-based social commerce echo similar types of concerns that cause the Federal Trade Commission to file suit against Meta.

22.    Ollywan seeks not protection from competition, but protection of competition itself.  Ollywan's goal is to ensure that innovative companies can compete on the merits rather than being eliminated through anticompetitive conduct.  Meta should not be allowed to transform competitive markets into concentrated monopolies that harm consumers, suppress innovation, and undermine the competitive process that drives economic progress.

**THE PARTIES**

**A.    PLAINTIFF—OLLYWAN**

23.    Plaintiff Ollywan is a private limited company registered in London, the United Kingdom.  Founded in 2016, Ollywan developed Winstag, a pioneering application that integrated social networking with native e-commerce functionality—implementing the proprietary business plan that founder Hilmi Konde had disclosed to Meta executives in November 2015.  Winstag combined photo-sharing with product tagging and affiliate shopping to create an innovative and unprecedented unified ecosystem.

**B.    DEFENDANT—META**

24.    Defendant Meta is a Delaware corporation with its principal place of business in Menlo Park, California.  Meta is one of the world's largest and most valuable companies, with a market capitalization of approximately $1.8 trillion.  Meta's principal businesses are in technologies that facilitate digital interactions and communications, including Facebook, which provides personal

social networking; Instagram, which provides personal social networking; Messenger, which provides mobile messaging services; and WhatsApp, which provides mobile messaging services.

**JURISDICTION AND VENUE**

25.     This Court has subject matter jurisdiction over Plaintiff's federal claims under the Clayton Antitrust Act, 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, and 1337. The Court has supplemental jurisdiction over plaintiff's California state law claim pursuant to 28 U.S.C. § 1367.

26.     This Court has personal jurisdiction over Meta because Meta's headquarters are located in Menlo Park, California. Meta has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and California law such that the exercise of jurisdiction over Meta would comport with due process.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Meta maintains its principal place of business in the State of California and in this District, and because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Meta may be found in or transacts business in this District.

**INTRADISTRICT ASSIGNMENT**

28.     This action is properly assigned to the San Jose Division of this District, pursuant to Civil Local Rule 3-2(c) and (e), because Meta is headquartered, and a substantial part of the events or omissions that give rise to the claim occurred, in San Mateo County, which is served by the San Jose Division.

**FACTUAL ALLEGATIONS**

A.     **RELEVANT MARKETS**

1.     **The Market for Social Networks**

29.     There is widespread recognition of a Relevant Market for Social Networks. Meta has a market share in the range of 70-98% depending on how that share is measured within this Relevant Market.

30.     For example, a Court in this District has held a class of consumers adequately alleged a Social Network Market, with Meta having monopoly power in that market. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 765 (N.D. Cal. 2022).  That Court pointed out that "the U.S. House of Representatives found during its recent investigation of competition in digital markets that social network services have the distinct purpose of 'facilitating communication and sharing content among groups of friends who choose each other and enjoy content in large part because of those relationships.'"  *Id.* at 770.  Moreover, social network services "are not reasonably interchangeable with online services outside the sphere of social media."  And "social network services are distinct from professional networking services like LinkedIn."  *Id.* at 769.  Furthermore, "LinkedIn itself has stressed that people use social network services and professional networking services for fundamentally different reasons.  As explained by LinkedIn in a presentation to potential advertisers, users of 'personal networks' typically share 'info on friends' and 'info on personal interests,' whereas users of 'professional networks' typically share 'career info.'"  *Id.*

31.     Similarly, another Court found the Federal Trade Commission (FTC) adequately alleged Meta possesses "significant enough to infer monopoly power" to survive the pleading stage in a closely related relevant market for personal social networking, or "PSN."  *Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34, 50 (D.D.C. 2022).  In both of these cases, the FTC and other plaintiffs explained Social Networks have three key elements: (1) they "are built on a social graph"; (2) they "include features that many users regularly employ to interact with personal connections"; and (3) they "include features that allow users to find and connect with other users."  *Id*. at 46.  Analyzing potential substitutes, the Court explained other "types of internet services" are not "adequate substitutes."  *Id*.

32.     Meta operates three actual or potential social networks: Facebook Blue, WhatsApp, and Instagram.  This case focuses on Instagram as Meta's only social network that offers Tag-based Shopping.

33.     Instagram is a photo and video sharing social networking platform founded in October 2010 by Kevin Systrom and Mike Krieger.  Meta (then Facebook) acquired Instagram in April 2012 for approximately $1 billion.

34.    At the time of acquisition, Instagram had 30 million users and no revenue.  Today, Instagram has approximately 2 billion monthly active users worldwide, making it the second-largest social media platform globally after Facebook, also owned by Meta.

35.    After Meta's acquisition, Instagram grew significantly to 100 million users by February 2013, 500 million by June 2016, 1 billion by June 2018, and 2 billion by 2021.  This represents a compound annual growth rate exceeding 50% over its first decade.

36.    Instagram generates over $50 billion in annual advertising revenue, and is projected to generate more than half of Meta's revenues in 2025.  Industry analysts estimate Instagram's current valuation exceeds $500 billion on a standalone basis.

37.    Instagram initially differentiated itself through mobile-first photo sharing with distinctive filters that made amateur photos appear professional.  This focus on visual content attracted a younger demographic than Facebook, with over 60% of users between ages 18–34.

38.    In the years that followed, Instagram systematically expanded its features to match successful competitors.  Stories (2016) replicated Snapchat's ephemeral content that disappears after 24 hours, reaching 250 million daily users within one year while Snapchat's growth stalled.  Reels (2020) copied TikTok's short-form video format with music and effects, receiving prime placement in Instagram's main navigation bar.  IGTV (2018) targeted YouTube's long-form video creators, while Live (2016) matched Periscope's broadcasting features.

39.    These features expanded Instagram's appeal to influencers, who increasingly relied on Instagram's unique market niche as a one-stop-shop of features for their massive user base.

40.    On the creator side, Instagram provides content creation and publishing tools, audience analytics, and algorithmic distribution systems that deliver creator content to potentially interested users.  On the consumer side, Instagram provides personalized content feeds, discovery mechanisms, and engagement tools that enable users to interact with creators and consume content tailored to their interests and preferences.

41.    Historically, Instagram's business model extracted value from this two-sided content market primarily through advertising revenue rather than direct creator monetization.  Instagram collects data on user preferences, engagement patterns, demographics, and behavior, which it

8

monetizes by selling targeted advertising placements to businesses seeking to reach audience segments. Content creators and users provided this data and engagement to Instagram without receiving direct financial compensation, while Instagram captured the commercial value through its advertising business.

42. This traditional content consumption model created dependency relationships that reinforced Instagram's market dominance. Content creators became dependent on access to Instagram's user base to build commercially viable audiences, while users concentrated their social media attention on Instagram due to its content variety, creator ecosystem, and content discovery capabilities. These mutual dependencies generated switching costs for both sides of the market, thereby locking in both content creators and users to the platform rather than abandon Instagram for competing platforms.

43. Instagram's control over the traditional content creator economy positioned the platform to extract monopoly rents from both creators and users. Content creators had no choice but to accept Instagram's terms of service, algorithmic content distribution decisions, and monetization limitations because Instagram provided the only viable path to reach large audiences for visual content. Users similarly had limited alternatives for discovering and consuming the breadth of creator content available on Instagram's platform.

## 2.    Market for Tag-based Shopping on Social Network Platforms

44. The Market for Tag-based Shopping on Social Network Platforms consists of commercial services that enable users to purchase products featured within social media content through direct interaction with tagged items. When content creators post photographs or videos featuring specific products, Tag-based Shopping services allow viewers to access product information and complete purchases without departing from the social media platform. This functionality transforms ordinary social media content into direct commerce opportunities, where users can acquire products they encounter while consuming entertainment and other content.

45. Tag-based Shopping on social network platforms represents a distinct category of commerce that combines three essential elements: (1) real-time product identification within social media content, (2) seamless transition from content consumption to purchase completion without

leaving the platform, and (3) social advertising generated from the use of products by influencers, creators, and other social media users with high visibility.  This combination creates a unique value proposition that cannot be replicated by traditional e-commerce or standalone social media advertising.

46.    Products in the market for Tag-based Shopping create the necessary glue between (1) social media containing potential purchasable products and (2) a shopping or checkout experience in which customers can execute purchase transactions on those products. Tag-based Shopping products typically include a "native" shopping experience so that the user does not need to leave the underlying social media platform to make purchases.

47.    Users have distinct demand for Tag-based Shopping services. Many Instagram users have made purchases based on products they discovered through tagged posts, and a large portion of those users would not have discovered these products through traditional search-based e-commerce platforms. These facts demonstrate that consumers view Tag-based Shopping as providing unique utility distinct from conventional online retail.

48.    The user journey in Tag-based Shopping differs fundamentally from traditional e-commerce. Traditional e-commerce requires consumers to initiate deliberate shopping searches with specific product intent. In contrast, Tag-based Shopping enables "discovery commerce" where consumers encounter products serendipitously while consuming entertainment or other content, creating purchase intent through social context and visual presentation rather than active product seeking.

49.    Traditional e-commerce platforms like Amazon, eBay, or retail websites are not reasonable substitutes for Tag-based Shopping services.  These platforms require consumers to search for products they already know they want, whereas Tag-based Shopping enables discovery of products consumers were not shopping for and did not know existed.  The fundamental difference in discovery mechanism—search-driven versus content-driven—creates distinct consumer use cases.

50.    Standalone affiliate marketing and influencer marketing programs are not reasonable substitutes because they lack the technical integration that enables seamless purchasing within social

platforms. External affiliate links require users to leave the social platform, navigate to separate, third party websites, create new accounts, and complete purchases in unfamiliar environments, creating friction that reduces conversion rates.

51.    General social media advertising is not a reasonable substitute because as clearly promotional content separate from organic social interactions and entertainment or other content. Tag-based Shopping appears as native content that is integrated trusted creator posts, providing social proof and authentic endorsement that traditional advertising cannot replicate.

52.    Traditional retail applications and mobile commerce platforms are not substitutes because they lack the social discovery and endorsement mechanisms that drive Tag-based Shopping behavior. Users cannot discover products through friends' and creators' authentic content consumption on traditional retail platforms.

53.    Tag-based Shopping requires specialized technical infrastructure that integrates social media content management systems with e-commerce transaction processing, inventory management, and revenue-sharing mechanisms between platforms, creators, and merchants. This technical complexity creates distinct barriers to entry and operational requirements separate from either traditional social media or conventional e-commerce.

54.    The revenue model for Tag-based Shopping differs from both traditional e-commerce and social media advertising. Tag-based Shopping generates revenue through transaction-based commissions shared between platforms, content creators, and merchants, creating three-way revenue relationships. Traditional e-commerce generates revenue through direct sales or marketplace fees, while social media advertising generates revenue through impression-based or click-based advertising fees.

55.    Tag-based Shopping requires unique data integration capabilities that combine social engagement metrics (likes, shares, comments) with commerce analytics (conversion rates, average order values, customer lifetime value) to optimize both content distribution and purchasing outcomes. This dual-optimization requirement distinguishes Tag-based Shopping from platforms that optimize for either engagement or sales, but not both simultaneously.

56.     Given the differing functionalities, a small but significant non-transitory increase in price ("SSNIP") would not cause users of Tag-based Shopping services to substitute toward traditional e-commerce or standalone social media advertising, confirming the boundaries of the distinct product market.

57.     Industry analysts consistently recognize Tag-based Shopping as a distinct market segment.  Leading research firms including eMarketer, Forrester, and McKinsey publish separate market analyses for "social commerce" or "social shopping" distinct from both traditional e-commerce and social media advertising markets.

58.     Major e-commerce platforms including Amazon, Shopify, and WooCommerce have developed specific integration tools and APIs designed exclusively for Tag-based Shopping functionality, demonstrating industry recognition that Tag-based Shopping requires specialized technical infrastructure distinct from traditional e-commerce solutions.

59.     Investment and venture capital markets treat Tag-based Shopping as a distinct category, with specialized funds and investment theses focused specifically on "social commerce" companies separate from traditional e-commerce or social media investments.

60.     A significant percentage of Tag-based Shopping transactions involve products in categories (fashion, home decor, lifestyle accessories) where visual presentation and social context provide crucial purchasing information that cannot be effectively conveyed through traditional search-based e-commerce interfaces.

61.     44% of Instagram users shop weekly using features like shopping tags, and a high percentage of Instagram users buy a product after seeing it on the platform.  Additionally, brands leveraging Instagram's shopping features saw an up to 42% increase in sales.

62.     The Market for Tag-based Shopping on Social Network Platforms exhibits characteristics that differentiate it from adjacent markets: (1) integration of product identification directly within social media posts and stories; (2) transition from content viewing to detailed product information and purchase completion; (3) leveraging of social proof through creator endorsements and audience engagement metrics; (4) utilization of social media algorithms to surface relevant

shopping content to users with demonstrated purchase intent; and (5) revenue-sharing arrangements between platforms, creators, and retailers based on transaction completion.

63.     Ollywan's product, Winstag, was a competitor in the Market for Tag-based Shopping on Social Network Platforms.  Its share was artificially small during its time of operation, given the conduct described herein.  Winstag was forced to shut down operations in August of 2023 in large part due to Meta's anticompetitive conduct.

64.     The dominant product in the Market for Tag-based Shopping on Social Network Platforms is Instagram Shopping.  Instagram Shopping has a dominant share of the Market for Tag-based Shopping on Social Network Platforms.

**B.     META ENGAGES IN A SCHEME TO MONOPOLIZE THE MARKET FOR TAG-BASED SHOPPING ON SOCIAL NETWORK PLATFORMS**

**1.     Meta Unfairly Implements Ollywan's Intellectual Property**

65.     Hilmi Konde ("Konde") is the director and CEO of Ollywan, the company that developed Winstag.  In that capacity, Konde created a sophisticated business plan to facilitate the development of a revolutionary business model that would integrate social networking with native e-commerce functionality.  Winstag was not merely a social commerce app with product tagging and affiliate shopping, but a pioneering application that would create a unified ecosystem where users could seamlessly transition from social interactions to commerce transactions within a single platform.

66.     On November 3, 2015, during a private, confidential meeting at Web Summit Dublin in Facebook's private lounge, Konde met with two Facebook executives: David Marcus ("Marcus"), then Vice President of Messaging Products at Meta, and Mike Schroepfer, then Meta's Chief Technology Officer.

67.     At the time, Konde called his business plan "Shopurt" and had prepared a formal business document describing the business plan dated September 30, 2015.  Before disclosing any proprietary information, Konde explicitly requested and received assurance from Marcus that the information to be shared would be kept confidential and not used without agreement between the parties.

68.     The meeting's confidential nature was further evidenced by: (1) its location in Facebook's private business lounge at Web Summit, separated from public areas; (2) Schroepfer's voluntary withdrawal upon recognizing proprietary information would be disclosed; and (3) Marcus's request that Konde provide detailed follow-up information via email.  With these confidentiality assurances established, Konde disclosed highly proprietary and sensitive details about the proposed business architecture to Meta: detailed revenue flows including specific commission structures and three-way revenue-sharing models; technical specifications for how his proposed system would integrate with iOS, Android, and Meta's platforms using proprietary API architecture; Shopurt's unique monetization plan combining social proof with transaction processing; and a strategy outlining how Shopurt would differentiate itself as the first Western "super app" implementation, and the first product worldwide to integrate photo tagging into a super app.

69.     During the confidential meeting, David Marcus expressed to Konde his enthusiasm for a partnership between Meta and Konde to implement Konde's business plan.  Marcus also provided his Meta email address to Konde, creating a channel for ongoing communications as Meta and Konde worked together towards the development of Winstag.  In his follow-up email that evening, Konde thanked Marcus for his time and general business feedback, noting he would refine the presentation of his already developed concept for future discussions.

70.     Marcus confirmed that "When you come back to us with a refined solution, we can potentially work together."  Marcus provided no technical input, made no substantive contributions to the business plan, and offered no modifications to the underlying business model—he merely expressed enthusiasm and requested more detailed information about Konde's pre-existing proprietary concept.

71.     As mentioned, Mike Schroepfer ("Schroepfer") was also initially present. Schroepfer was Meta's Chief Technology Officer, and in that role was aware he should not be exposed to Konde's proprietary information.  Acknowledging that fact, Schroepfer voluntarily excused himself from the confidential meeting when it became clearer that Konde would need to disclose proprietary information to Mr. Marcus for the partnership discussions to proceed further.

72.     Konde also began parallel conversations with a Meta executive named Akin Babayigit ("Babayigit"), who was Facebook's Head of Audience Network across Europe.  Konde informed Babayigit about the meeting with Marcus and conveyed Marcus's enthusiasm for the concept and his statement that they could "potentially work together."  Babayigit acknowledged receiving this information about the November 3rd meeting and Marcus's positive response.

73.     Konde then got to work.  On March 22, 2016, Ollywan was incorporated in the United Kingdom to bring the shoppable feature concept into practice.  Konde was appointed as the director of Ollywan, and hired a robust software development team.

74.     Over the coming months, Ollywan implemented Konde's proprietary business plan, creating the social commerce app integrating photo-sharing with product tagging and affiliate shopping, naming the product "Winstag."  On August 19, 2016, Ollywan filed an EU trademark for "WINSTAG" (No. 015763634, Classes 9 and 42) to protect the brand.  In September 2016, Winstag launched globally, including on the U.S.-based App Store and Google Play Store, announcing its feature that "[u]sers can follow their friends and bloggers to see what they are wearing and buy the pieces they like through the tags of people they follow."

75.     Imagine Konde's surprise, however, when Meta launched a copycat shortly thereafter.  For around four years after Meta acquired Instagram, it had no social commerce features available on Instagram.  But then, suddenly, after stringing Ollywan along for a year, Meta launched its copycat product named "Instagram Shopping" in November 2016—twelve months after Konde's confidential disclosure.  Instagram Shopping implemented many of the proprietary details disclosed to Meta one year earlier, *i.e.*, allowing users to add product tags and affiliate links to Instagram posts and integrating tagged products to an easy-to-use shopping cart.  Meta's theft was blatant—many of Instagram Shopping's features matched one for one to details Konde revealed in the partnership meeting that occurred one year earlier.

### 2.     Meta Ties Its Social Networks To Market for Tag-based Shopping on Social Network Platforms

76.     Instagram Shopping is not a Social Network, and it could be a stand-alone product that does not need to be integrated with a Social Network.

77.     Instagram's core social networking functionality constitutes a distinct product that enables users to create profiles, share content, follow other users, and engage in social interactions through likes, comments, and direct messaging.  Instagram's social networking features serve the primary purpose of facilitating personal connections and content consumption among users' social networks.

78.     Instagram's social networking product competes in the well-established Market for Social Networks, where it faces competition from platforms like TikTok, Snapchat, Twitter/X, and LinkedIn.  Courts have repeatedly recognized social networking as a distinct product market separate from other digital services.

79.     Instagram Shopping constitutes a separate and distinct product that provides tag-based commerce functionality, enabling product discovery, price comparison, merchant interaction, and transaction completion.  Instagram Shopping serves the primary purpose of facilitating commercial transactions between consumers and retailers through social content.

80.     Instagram Shopping competes in the distinct Market for Tag-based Shopping on Social Network Platforms, where it could theoretically face competition from standalone social commerce applications, third-party shopping integrations, or alternative Tag-based Shopping services.

81.      Instagram Shopping requires separate technical infrastructure including payment processing systems, merchant onboarding and verification processes, inventory management integration, commission calculation and distribution systems, and specialized customer service for transaction-related issues—all distinct from social networking infrastructure.

82.     Instagram Shopping generates revenue through transaction-based commissions and fees separate from Instagram's social networking advertising revenue model, demonstrating distinct commercial purposes and value propositions.

83.     While Instagram Shopping was a virtual clone from a feature perspective to Winstag, it did have one crucial difference that gave it an insurmountable lead—a direct connection to Meta's fastest-growing, and most important social network (and especially for the key commerce demographic of teenagers and young adults), Instagram.

84.     As described below, there is widespread industry, legal, and economic recognition of Meta's utter dominance in the Market for Social Networks.  Meta has at least an eighty-five percent share in this market, which is a crucial input for The Market for Tag-based Shopping on Social Network Platforms.

85.     There is no legitimate economic or technical reason that a Social Network must be technologically integrated with a Tag-based Shopping application.  Meta or any other Social Network provider could create technical means, such as an application-programming-interfaces ("API"), to allow Tag-based Shopping applications to thrive on the Social Network.  Or, at the very least, refrain from taking steps that are hostile to Tag-based Shopping applications seeking to create complementary applications for users of the Social Network.

86.     Meta has designed Instagram Shopping as an inseparable component of Instagram's core platform, requiring users who want Tag-based Shopping functionality to accept and use Instagram's social networking services, and requiring Instagram users who encounter shopping-tagged content to use Instagram Shopping exclusively.

87.     Meta deliberately prevents interoperability between Instagram's social networking platform and competing Tag-based Shopping services.  Meta prohibits third-party shopping applications from accessing Instagram's user data, social graph information, or content distribution systems through its API restrictions and terms of service.

88.     Users cannot access Instagram Shopping functionality without creating and maintaining an Instagram social networking account, providing personal profile information, and accepting Instagram's social networking terms of service.  This forced bundling compels consumers who desire Tag-based Shopping services to also consume Instagram's social networking product.

89.     Content creators cannot utilize alternative Tag-based Shopping services while maintaining full access to Instagram's audience and engagement features.  Content creators who attempt to escape Instagram's orbit and create content solely on non-Instagram platforms cannot generate enough social traction to cause a meaningful amount of Tag-based Shopping to occur on such platforms.

90.     Meta requires merchants who want to reach Instagram users through shopping features to integrate exclusively with Instagram Shopping systems rather than providing access to competing Tag-based Shopping services, extending the tying arrangement to the merchant side of the market.

91.     There is no technical requirement, nor procompetitive reason, that social networking and Tag-based Shopping be integrated into a single product.  Meta previously allowed greater integration between one of its social networks—Facebook—and third-party services, demonstrating that technical separation is feasible.  Meta's decision to restrict interoperability for Instagram was a strategic choice to foreclose competition rather than a technical necessity.

92.     Meta's integration of Instagram and Instagram Shopping does not generate consumer benefits that could not be achieved through interoperable systems.  Third-party shopping services could provide equal or superior functionality if granted the ability to access to Instagram's platform and user base.

93.     Any claimed efficiencies from integration are outweighed by the anticompetitive harm from foreclosing competition and innovation in Tag-based Shopping services.  Less restrictive alternatives, such as open APIs or neutral integration standards, could achieve any legitimate efficiency benefits without anticompetitive tying effects.

**C.     META ENGAGES IN SUPPRESSION OF THE "WINSTAG" TRADEMARK**

94.     Meta operates one of the dominant digital advertising platforms in the United States, controlling approximately 23% of all U.S. digital advertising spending and 65% of social media advertising revenue.  For businesses targeting consumers under age 35, Meta's platforms (Facebook and especially Instagram) represent an essential advertising channel that cannot be practically substituted.

95.     For social commerce and mobile applications seeking to acquire users, Meta's advertising platforms are particularly critical because they enable precise targeting based on user interests, behaviors, and demographics that are essential for cost-effective customer acquisition.

96.     Meta's advertising platform exhibits characteristics of market power including: (a) the ability to unilaterally change advertising policies and pricing without significant advertiser

defection; (b) pricing power demonstrated by consistent annual increases in cost-per-click rates; (c) essential facility characteristics for businesses requiring social media user acquisition; and (d) barriers to entry including data advantages and network effects that competitors cannot replicate.

97.    Meta implemented a discriminatory enforcement policy regarding the "Winstag" name. While Meta allowed Ollywan to create a "Winstag" Facebook Business Page and purchase advertising campaigns under the "Winstag" name for both page promotion and app installs, Meta simultaneously blocked "Winstag" as an app name in the Facebook Developer Console—thereby forcing the use of "W1nstag" for OAuth authentication, which is a necessary component of Facebook's login process ("Facebook Login"). This created a significant trust barrier: users who clicked "Winstag" advertisements and downloaded the "Winstag" app from app stores were then confronted with "W1nstag wants to access your data" during Facebook Login, causing user confusion and abandonment at the critical authentication moment.

98.    Meta's justification for suppressing "Winstag" in the context of the Facebook Developer Console withers under basic scrutiny. Under established trademark law, likelihood of confusion requires analysis of multiple factors including similarity of marks, proximity of goods/services, strength of the prior mark, evidence of actual confusion, and consumer sophistication. Meta's blanket blocking of "Winstag" based solely on a shared letter sequence ignores these established legal standards and constitutes pretextual enforcement.

99.    Meta's "confusing similarity" determination also lacks objective basis. The marks "Winstag" and "Instagram" differ in: (a) overall commercial impression and meaning; (b) visual appearance and design; (c) phonetic sound when spoken; (d) length and syllable structure; and (e) consumer association and branding context. No reasonable consumer would confuse "Winstag" with "Instagram" based on the shared "insta" sequence.

100.    Underscoring the lack of merit for Meta's justification, Meta's enforcement is demonstrably inconsistent. Within the Facebook Developer Console itself, Meta allows app names like "Instant," "Grammar," and "Install" that contain "insta" or "gram" substrings, while blocking "Winstag" and "Gramafon." Meanwhile, Meta permits Facebook Business Pages and advertising

for "InstaCare," "InstaFix," "InstaPay," "InstaDelivery," and other "insta-" prefixed brands without claiming trademark confusion.

101.    Meta's trademark enforcement database contains over 15,000 approved advertisements for businesses using "insta" in their names or slogans, demonstrating that Meta does not consistently apply its claimed "confusing similarity" standard.  These approved advertisements include direct competitors to Meta's services, such as "InstantGram" photo services and "InstaMessenger" communication tools.

102.    Within the Developer Console, Meta permits app names that contain the same substrings Meta claims are problematic, including "Instant" (containing "insta") and "Grammar" (containing "gram").    Meta also allows Facebook Business Pages for "InstantGram," "InstaMessenger," and similar services.  This pattern—allowing these names where they generate advertising revenue but selectively blocking competitive threats in the Developer Console—demonstrates that Meta's enforcement against "Winstag" was motivated to suppress competition and ensure its dominance in the Market for Tag-based Shopping.

103.    Meta's enforcement actions against "Winstag" in the Developer Console began after Instagram Shopping's launch, while Meta continued accepting advertising revenue from "Winstag" campaigns.  Prior to Instagram Shopping's launch, Meta had not raised objections to Ollywan's use of "Winstag" in any context, including the Facebook Business Page created in September 2016.

104.    Given Meta's selective enforcement—accepting "Winstag" for revenue-generating advertisements while blocking it in the Developer Console where Ollywan would enable OAuth authentication—the clear inference is that forcing "W1nstag" for OAuth was designed to impair competition rather than effect legitimate trademark protection.

105.    Meta's forced use of "W1nstag" in the Developer Console sabotaged user acquisition and harmed Ollywan's ability to grow its new product.  When users who clicked "Winstag" advertisements and downloaded the "Winstag" app attempted to authenticate using Facebook Login (OAuth), they were presented with a screen requesting permissions for "W1nstag"—not the "Winstag" name they recognized from advertisements and app stores.  This mismatch raised security concerns and caused user abandonment.

106.    The OAuth naming mismatch effectively foreclosed Winstag from converting advertising spend into active users.  While Meta accepted payment for "Winstag" advertising campaigns, the forced "W1nstag" authentication undermined the value of that advertising by creating confusion at the critical moment of user registration.

107.    Meta's suppression prevents Winstag from developing brand recognition and consumer awareness necessary to compete effectively in the Market for Tag-based Shopping.  Brand awareness is particularly critical for social commerce applications because users must trust applications with both social data and financial information.

108.    The economic impact of Meta's trademark suppression extends beyond direct advertising effects to include reduced investor confidence, impaired partnership negotiations, and diminished ability to attract content creators and merchants to Winstag's platform.  The OAuth naming confusion created a critical barrier to investment: potential investors conducting due diligence would immediately notice the "Winstag" advertising versus "W1nstag" authentication discrepancy, raising concerns about brand integrity, conversion metrics, and Meta's apparent targeting of the company.  This naming mismatch made Winstag appear unprofessional or potentially fraudulent to investors, effectively foreclosing access to venture capital necessary for competing in the social commerce market.

109.    Specifically, the OAuth naming confusion directly impacted key metrics: user registration completion rates dropped significantly when users encountered the "W1nstag" authentication screen after clicking "Winstag" advertisements.  Potential merchant partners expressed concerns about brand consistency and user trust when informed of the forced naming discrepancy.  The inability to maintain consistent branding across advertising and authentication created a "broken funnel" effect where advertising spend failed to convert to active users at expected industry rates.  Furthermore, the significant personal investment by Konde became stranded capital when the systematic OAuth sabotage prevented both user acquisition and follow-on investment despite successful app store placement.  The forced "W1nstag" naming also prevented effective search engine optimization and social media virality, as users searching for "Winstag" after seeing advertisements would encounter authentication under a different name.  This systematic

21

undermining of brand coherence made it impossible to build the network effects essential for social commerce platforms, where user trust and peer recommendations drive adoption.

110.    Meta's claimed trademark protection interest does not justify the breadth and selectivity of its enforcement against "Winstag."  If Meta genuinely believed "Winstag" created consumer confusion with "Instagram," Meta would apply consistent enforcement against all businesses using "insta" prefixes, rather than selective enforcement against competitive threats.

111.    Meta could protect any legitimate trademark interests through less restrictive means, such as requiring disclaimer language in advertisements, approving advertising content on a case-by-case basis, or seeking negotiated solutions that permit Winstag advertising while addressing any genuine confusion concerns.

112.    Meta's enforcement actions violate the principle that trademark rights should not be used to suppress competition in markets where the trademark owner competes.  Meta's use of "Instagram" trademark rights to exclude competitors in the separate Tag-based Shopping market exceeds the legitimate scope of trademark protection.

113.    Meta's discriminatory naming enforcement continues through the present.  Although Winstag's app became unavailable on app stores as of August 13, 2023, Meta still accepts advertising revenue for "Winstag" campaigns while maintaining the block on "Winstag" in the Developer Console.   On November 10, 2024, Meta sent an automated email addressed to "W1nstag," confirming the continued enforcement of the discriminatory naming policy.

114.    Meta's Developer Console at developers.facebook.com continues to automatically enforce the "W1nstag" requirement while allowing similar names like "Instant" and "Grammar." Testing conducted on July 21, 2025 confirmed this ongoing discrimination.  Meta's delegation of this discriminatory policy to automated systems does not eliminate antitrust liability.

115.    The continuing enforcement in the Developer Console means Ollywan cannot restart operations with consistent branding.  Even today, Meta would accept advertising revenue for "Winstag" campaigns while forcing "W1nstag" for OAuth authentication, perpetuating the same trust-destroying confusion that contributed to Winstag's closure in August 2023.

116.    Meta's trademark suppression operates in conjunction with its product tying and unfair copying to create a comprehensive scheme to monopolize the Market for Tag-based Shopping.  While Meta leverages its social networking monopoly to preference Instagram Shopping through technical integration and the other conduct described above, its use of its dominant position in advertising only strengthens the anticompetitive effects of Meta's conduct.

117.    Meta's multi-platform exclusion strategy creates insurmountable barriers to entry in the Market for Tag-based Shopping.  Competitors and potential competitors face both technical foreclosure (inability to integrate with Instagram's user base) and marketing foreclosure (inability to advertise effectively through Meta's platforms), making successful competition economically impossible.

118.    Meta's trademark suppression amplifies the anticompetitive effects of its other exclusionary practices by preventing competitors from developing the brand recognition and user awareness necessary to challenge Instagram Shopping's market dominance, even if competitors could overcome technical integration barriers.

119.    Meta's selective and pretextual trademark enforcement demonstrates specific intent to monopolize the Market for Tag-based Shopping rather than to effect legitimate intellectual property protection.  The temporal correlation between Instagram Shopping's launch and Winstag advertising suppression, combined with disparate treatment of competitive versus non-competitive "insta" marks, evidences anticompetitive intent.

120.    Ollywan does not allege Meta blocked all uses of "Winstag."  The evidence demonstrates a more sophisticated pattern: Meta greedily segregated its enforcement based on revenue potential versus competitive threat.  Where "Winstag" generated advertising revenue for Meta (e.g., Facebook Pages, ad campaigns), it was permitted.  Where "Winstag" would enable authentic user authentication and trust building (Developer Console/OAuth) in a way that might threaten Meta's dominance in the Market for Tag-based Shopping, it was blocked.  This selective enforcement based on competitive impact rather than consistent trademark principles proves the pretextual nature of Meta's conduct.

**ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY**

121.   Meta's coordinated anticompetitive conduct—including unfair copying, illegal tying, and trademark suppression—has created substantial harm to competition in the Market for Tag-based Shopping on Social Network Platforms, while generating corresponding antitrust injuries to consumers, content creators, merchants, and competitors.

122.   Meta's exclusionary scheme operates through multiple reinforcing mechanisms that collectively foreclose competition and maintain monopoly power: (a) technical foreclosure through mandatory tying of Instagram social networking to Instagram Shopping; (b) marketing foreclosure through OAuth authentication sabotage and Developer Console naming restrictions that undermined both competitor branding and ability to generate a user base; (c) innovation foreclosure through unfair competition; and (d) economic foreclosure through extraction of monopoly rents and elimination of competitive alternatives.

123.   The cumulative effect of Meta's conduct has been to transform the nascent and potentially competitive Market for Tag-based Shopping on Social Network Platforms into a monopolized market where Meta extracts billions in monopoly profits while consumers, creators, and merchants suffer reduced innovation, higher prices, and diminished quality of service.

124.   Meta's exclusionary conduct has prevented the development of a competitive Market for Tag-based Shopping.  At the time of Instagram Shopping's launch in November 2016, multiple companies including Ollywan were developing innovative social commerce solutions that could have created a competitive ecosystem with consumer choice, price competition, and innovation rivalry.

125.   Instead of competing on the merits of their respective products, Meta leveraged its social networking monopoly power to ensure Instagram Shopping captured a dominant market share regardless of product quality, feature innovation, or consumer preference.  This outcome demonstrates classic monopolization where market success derives from exclusionary conduct rather than superior performance.

126.   The foreclosure has been so complete that no significant competitor to Instagram Shopping has been able to establish sustainable market presence, despite the multi-billion dollar size

and rapid growth of the social commerce sector.  This lack of viable competition is particularly telling given the substantial venture capital investment and entrepreneurial interest in social commerce innovation.

127.    Meta's monopolization has eliminated the competitive pressure that would otherwise drive innovation in Tag-based Shopping features, user experience improvements, and creator-friendly monetization options.  Without competitive threats, Meta lacks market-based incentives to develop superior products or respond to consumer preferences.

128.    The suppression of competitive alternatives has deprived the market of innovation that would have emerged from competitive rivalry.  Companies like Ollywan would have, in a competitive market that never came to be, developed features and approaches that differed from Meta's Instagram Shopping model, potentially offering consumers superior functionality, better privacy protection, more favorable creator revenue sharing, or enhanced merchant services.

129.    Meta's unfair competition, in the form of copying Ollywan's business plan, specifically eliminated the innovation advantages that competitors like Ollywan had developed through independent research and development.  By copying innovative features rather than developing them through internal innovation, Meta reduced overall industry innovation while free-riding on competitor investments.

130.    Meta's monopoly power in the Market for Tag-based Shopping enables the extraction of supracompetitive profits through commission rates and fees that exceed levels that would prevail in competitive markets.  Meta charges merchants commission rates of 5-7% for Instagram Shopping transactions, higher than rates that would prevail under competition.

131.    These supracompetitive commission rates are passed through to consumers in the form of higher product prices.  Merchants incorporate platform commission costs into retail pricing, meaning Meta's monopoly commissions directly increase prices paid by consumers purchasing products through social commerce channels.

132.    Meta's pricing power is evidenced by its ability to unilaterally increase commission rates and modify fee structures without losing substantial merchant participation, demonstrating the lack of competitive alternatives that would constrain monopoly pricing.

133.    Consumer welfare has been harmed through reduced quality and innovation in Tag-based Shopping services compared to what would exist in competitive markets.    Without competitive pressure, Meta has no incentive to improve Instagram Shopping's user interface, privacy protections, customer service quality, or feature development.

134.    Competitive alternatives that were foreclosed by Meta's conduct offered superior features including better product-discovery algorithms, enhanced privacy protections, more intuitive user interfaces, and improved integration with external e-commerce systems.    Consumers have been deprived of these quality improvements due to Meta's exclusionary conduct.

135.    The failure of multiple well-funded social commerce startups due to Meta's exclusionary barriers has created a "competition desert" where investors are reluctant to fund innovative competitors because of the demonstrated inability to overcome Meta's anticompetitive advantages.

136.    This suppression of startup activity represents a substantial loss to dynamic economic development, as social commerce represents a rapidly growing sector where competitive innovation could generate significant economic value and consumer benefits.

137.    The OAuth sabotage pattern exemplifies this suppression: from May 2018 through August 2023, every user who attempted to authenticate Winstag encountered the "W1nstag" confusion at the critical data-sharing moment, representing thousands of individual instances of Meta undermining a competitor's user acquisition while simultaneously accepting that competitor's advertising payments.    This created a systematic destruction of conversion value that made advertising economically irrational, despite Meta's willingness to accept payment for such advertising.

138.    Since November 2016, Meta has committed continuing violations of the antitrust laws, resulting in monetary injury to Ollywan.    As described above, Meta has engaged in discriminatory enforcement of naming policies, forcing "W1nstag" in its Developer Console while accepting advertising revenue for "Winstag" campaigns.    This dual policy was designed to acquire, maintain, and prolong Meta's monopoly position.    Specifically, Meta forced "W1nstag" for OAuth

authentication while allowing "Winstag" for revenue-generating advertisements, creating deliberate user confusion that destroyed trust and conversion rates.

139.    Every instance of OAuth authentication displaying "W1nstag" instead of "Winstag" was a new and independent overt act that inflicted new and accumulating economic injuries on Ollywan and consumers, and those injuries continued through August 2023 when Winstag ceased operation.  The continuing enforcement against Winstag in the Developer Console means Ollywan cannot restart operations with consistent branding.

140.    Ollywan's claims are also timely under the tolling provision of § 5(i) of the Clayton Act, which tolls the statute of limitations for any claims "based in whole or in part on any matter complained of" in a parallel government suit.  The Federal Trade Commission has brought an antitrust matter against Meta that is currently pending.  *Fed. Trade Comm'n v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 33 (D.D.C. 2024).  That matter has significant overlap with the instant case, including in its analysis of Meta's dominance of the Relevant Market for Social Networks.

**INTERSTATE TRADE AND COMMERCE**

141.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

142.    Meta's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

(a)    Meta has provided a social media network and platform and integrated e-commerce marketplace and has exchanged consumer information and attention with advertisers and consumers throughout the United States.

(b)    Meta has used instrumentalities of interstate commerce to provide social media services and platform and integrated e-commerce marketplace to consumers and advertisers throughout the United States.

(c)    In furtherance of the anticompetitive scheme alleged herein, Meta employees have traveled between states and have exchanged communications through interstate wire communications and via United States mail; and

(d)     The anticompetitive scheme alleged herein has affected billions of dollars of commerce.   Meta has inflicted antitrust injury by artificially excluding competitors, reducing consumer choice, and raising prices paid by consumers, and causing the other antitrust injuries described herein.

**CAUSES OF ACTION**

**COUNT I**

**Sherman Act Section 2 – Monopolization (15 U.S.C. § 2)**

143.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

144.    Meta has willfully acquired and maintained monopoly power in the Market for Social Networks.

145.    Meta possesses monopoly power in the Market for Social Networks.  Meta has the power to control prices or exclude competition in the Market for Social Networks.

146.    Meta has around 85% market share in the Market for Social Networks, and there are substantial barriers to new entry.

147.    There is a separate Relevant Market for Tag-based Shopping on Social Network Platforms.  Meta, through its Instagram Shopping product, has a dominant share of this Relevant Market.

148.    Meta has acquired, and now maintains, monopoly power in the Market for Tag-based Shopping on Social Network Platforms through the conduct described above including, but not limited to, creating a copycat product in the form of Instagram Shopping; tying Social Networking to Tag-based Shopping on Social Network Platforms; and using its ability to control must-have advertisements on its Social Network Platforms to suppress the brands of competitors.

149.    Meta's conduct has had a substantial effect on interstate commerce.

**COUNT II**

**Sherman Act Section 2 – Attempted Monopolization**

150.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

151.    Meta has willfully acquired and maintained monopoly power in the Market for Social Networks.

152.    Meta possesses monopoly power in the Market for Social Networks.  Meta has the power to control prices or exclude competition in the Market for Social Networks.

153.    Meta has around 85% market share in the Market for Social Networks, and there are substantial barriers to new entry.

154.    There is a separate Relevant Market for Tag-based Shopping on Social Network Platforms.  Meta, through its Instagram Shopping product, has a dominant share of this Relevant Market.

155.    Meta has attempted to acquire monopoly power in the Market for Tag-based Shopping on Social Network Platforms through conduct described above including, but not limited to: creating a copycat product in the form of Instagram Shopping; tying Social Networking to Tag-based Shopping on Social Network Platforms; and using its ability to control must-have advertisements on its Social Network Platforms to suppress the brands of competitors.

156.    Meta has a specific intent to monopolize the Market for Tag-based Shopping on Social Network Platforms.

157.    Meta's conduct has had a substantial effect on interstate commerce.

### COUNT III

### Unfair Competition – California Business & Professions Code § 17200 *et seq.*

158.    Plaintiff restates and incorporates the foregoing paragraphs as though fully set forth herein.

159.    Absent injunctive relief, Plaintiff will continue to suffer loss of money or property and an economic injury in fact, specifically being unable to re-enter the relevant market and compete, and thus has standing to seek relief under section 17200.

160.    Meta's actions establish a claim of unlawful competition on multiple grounds. Meta's anticompetitive and tortious conduct gives rise to a claim under the "unlawful" business practices prong of the UCL.

161.    Similarly, Meta's anticompetitive conduct gives rise to a claim under the "unfair" business practices prong of the UCL.

162.    As a direct and proximate result of Meta's conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost business and potential bankruptcy.

163.    Plaintiff has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of Plaintiff's business relationships, client goodwill, and ability to continue operating.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the following relief:

(a)    Damages in an amount to be determined;

(b)    Treble damages;

(c)    Attorneys' fees;

(d)    Costs;

(e)    Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

(f)    Punitive damages;

(g)    Injunctive relief;

(h)    Declaratory relief, including but not limited to a declaration and judgment that Meta's conduct alleged in the Complaint violates the laws alleged in the Complaint; and

(i)    Such other and further relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED: September 26, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  */s/ Sam Stake*
_____

Sam S. Stake (Cal. Bar No. 257916)
samstake@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600

Sami H. Rashid (*pro hac vice* forthcoming)
samirashid@quinnemanuel.com
David LeRay (*pro hac vice* forthcoming)
davidleray@quinnemanuel.com
295 Fifth Avenue, 9th Floor
New York, New York 10016
Telephone: (212) 849-7000

*Attorneys for Ollywan Limited*

CIVIL COMPLAINT